FILED
2020 Mar-17 AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SANDRA HUTCHINSON LACKEY, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 2:18-cv-00429-RDP |
| } | |
| LA PETITE ACADEMY, INC., } | |
| } | |
| Defendant. } | |

## MEMORANDUM OPINION

This case is before the court on Defendant La Petite Academy, Inc.'s Motion for Summary Judgment. (Doc. # 18). The Motion is fully briefed (Docs. # 18, 19, 20, 21, 22) and ripe for review. After careful consideration, and for the reasons discussed below, Defendant's Motion (Doc. # 18) is due to be granted, and Plaintiff's Title VII and 42 U.S.C. § 1981 claims are due to be dismissed with prejudice.

**I.   Background**[1]

Sandra Hutchinson Lackey ("Lackey" or "Plaintiff") alleges that La Petite Academy, Inc., ("LPA" or "Defendant") intentionally discriminated against her based on her race (Caucasian) in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.[2] (Doc. #

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Title VII racial disparate treatment claims and § 1981 race discrimination claims are evaluated using the same analytical framework. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."). For ease of

1). The court first addresses Lackey's employment history with LPA as well as LPA's employee handbook. The court then turns to the incident that is the basis of Plaintiff's claim.

### A. Plaintiff's Employment with La Petite Academy

Lackey is a Caucasian female who worked for La Petite Academy[3] ("LPA" or "Defendant"). (Doc. # 1 at ¶¶ 2, 17). On December 4, 2014, Plaintiff began her employment at Childtime Childcare Center—which is one of LPA's sister schools—in Oklahoma City, Oklahoma. (Doc. # 20-1 at ¶13). Childtime and LPA are owned by the same parent company, Learning Care Group.[4] (*Id.* at ¶ 3). While at Childtime Childcare Center, Lackey served as a lead teacher and primarily supervised the infant to one-year old classrooms. (*Id.* at ¶ 13). In October 2016, for personal reasons, Plaintiff transferred from Childtime Childcare Center in Oklahoma City, Oklahoma, to LPA in Trussville, Alabama. (Doc. # 20-2 at 25-26).

At the time of Plaintiff's transfer, the district manager in charge of all LPA branches in Alabama was Carol Simms ("Simms"). (Doc. # 20-1 at ¶¶ 3, 5-7). Simms is a Caucasian female. (*Id.* at ¶ 2).The director at LPA's Trussville location was Iris Adams ("Adams"), and the assistant director was Tekota Baity ("Baity"). (*Id.* at ¶ 16). Both Adams and Baity are African American females. (Docs. # 20-1 at ¶ 16; 20-2 at 75). Adams approved Lackey's transfer to LPA in Trussville. (Doc. # 20-13 at 33-35).

While at LPA, Lackey primarily worked as a lead teacher in the two-year old classroom. (Doc. # 20-2 at 26). Although Lackey preferred the infant to one-year old classrooms, there was

---

reference, the court will refer to Plaintiff's discrimination claims as her Title VII claims, but does so with the understanding that the same analysis applies to her § 1981 claims.

[3] LPA is also referred to throughout the record as the Grayson Valley Center. To avoid confusion, the court refers to Defendant's Trussville, Alabama location as "LPA."

[4] Learning care group maintains several brands including La Petite Academy, Childtime Learning Center, Children's Courtyard, Montessori Unlimited, Everbrook Academy, Creative Kids Learning Center, and Pathways Learning Academy. (Doc. # 20-1 at ¶ 3).

2

not a lead teacher position available at the time she transferred to LPA. (*Id.* at 109). As a lead teacher, Lackey was responsible for monitoring children in her assigned classroom. (*Id.*). She typically worked Monday through Friday, from 6:00 a.m. to 6:00 p.m. (*Id.* at 47, 57). Lackey testified that, generally, she enjoyed her job at LPA and did not dread going to work. (Doc. # 20-2 at 100-01).

### B. LPA's Employee Handbook

Learning Care Group maintains a universal employee handbook. (Doc. # 20-3 to Doc. # 20-7). The employee handbook contains an anti-discrimination policy that prohibits unlawful conduct based on certain protected classifications, including race. (Doc. # 20-3 at 21; Doc. # 20-4 at 1, 7-9; Doc. # 20-6 at 7-10). The employee handbook also details a comprehensive reporting procedure for employees to report concerns about discrimination. (Doc. # 20-4 at 1, 7-9; Doc. # 20-6 at 7-10). Employees who wish to make a complaint about their employment, or otherwise report illegal or unlawful activity, have alternative complaint procedures available to them. (*Id.*). The employee handbook directs employees to contact a district manager, a human resources representative, the director of human resources, the chief human resources officer, or any other LPA officer. (*Id.*). Further, the handbook provides that employees may utilize LPA's anonymous hotline number (the EthicsPoint hotline) or online complaint form (the EthicsPoint website) to make a complaint about their employment, or report illegal unlawful activity. (*Id.*). Lackey received a copy of the employee handbook on two separate occasions. (Doc. # 20-2 at 38-40).

### C. Plaintiff's Resignation

In November 2016, Simms received complaints from two parents of children at LPA indicating that Lackey had identified their children by name during her conversations with parents

3

of other children in her classroom.[5] (Doc. # 20-1 at ¶ 18). Simms determined that Lackey should receive coaching on this issue, and directed Adams to prepare a "Note to Employee File" (Doc. #20-13 at 42) and to meet with Lackey to discuss the matter. (*Id.*). During the meeting, Adams was to present Lackey with the "Note to Employee File," and provide coaching. (*Id.*).

On November 16, 2016, Adams and Baity met with Lackey to discuss the parental complaints, give her the "Note the Employee File," and provide her with coaching.[6] (Doc. # 20-2 at 74-76). Lackey testified that before the meeting she was having a normal day at work. She did not feel like she as being picked on or targeted in any way. (*Id*. at 82-83). At the meeting, Adams and Baity discussed the parental complaints with Lackey, and presented her with the "Note to File." (*Id.* at 74-76). According to Adams and Baity, Lackey abruptly quit and voluntarily left LPA during the middle of her shift. (Doc. # 20-13 at 55-56, 86).

Lackey disputes LPA's version of events. She testified that she met with Adams and Baity, but denied knowing anything about the parent complaint. (Doc. # 20-2 at 80-81). She further claims she tried to explain herself, but Adams raised her voice, called Lackey a liar, and stated that she (Adams) did not believe her. (*Id.*). Lackey testified that Adams's conduct was upsetting, and because she was upset, Lackey asked if she could go ahead and leave for the day. (*Id.*). Lackey left LPA, but it is not clear whether she was given permission to leave for the day. (*Id.*).

---

[5] Lackey testified that the parent complaints were related to two children in her classroom that she could not control. (Doc. # 20-2 at 76-77). Lackey testified that she talked with Adams about the behavior of the children, but that Adams failed to do anything about it. (Doc. # 20-2 at 76-77). Further, Lackey testified that the parental complaints were actually in regard to Adams's failure to correct the out-of-control behavior of the children. (Doc. # 20-2 at 76-77). Regardless, it is undisputed that two different parents complained about Lackey and/or her conduct. (Doc. # 20-2 at 76).

[6] There is also Rule 56 evidence that Melissa Hodge (an LPA employee and lead teacher) was present during the meeting. (Doc. # 20-2 at 74-75). However, Lackey testified that she was unsure if Hodge, or someone else, was at the meeting. (*Id*.).

After Lackey left, she received a phone call from Simms. (Doc. # 20-2 at 82, 85). Simms asked Lackey to return to work. (*Id.*). Lackey testified that she did not recall why Simms asked her to return to work, but that she agreed to go back to LPA. (*Id.* at 87). Simms and Adams testified that Lackey was asked to return to LPA because they were short-staffed, and Lackey's absence created problems with the required teacher-to child-ratio. (Docs. # 20-12 at 17-18; 20-13 at 56-57).

After Lackey returned, she clocked in and went to her assigned classroom. (Doc. # 20-2 at 87). After a few minutes, Lackey was asked by Adams to move from her usual classroom to a different classroom. (Doc. # 20-2 at 87-88). After switching classrooms, an unnamed LPA teacher told Lackey to go see Baity, who was in the infant room. (*Id.* at 88). Baity told Lackey to take a break to "get cooled off" because "she knew [Lackey] was still upset." (*Id.*).

Lackey returned from lunch thirty minutes later and was preparing to clock in, when she was approached by Adams. (*Id.*).While in the process of clocking in, Lackey testified that Adams "gave [her] a piece of paper, told [her] what to write and on the paper and stuff." (*Id.*). According to Lackey, Adams instructed her to write the following, "I Sandra Hutchinson [Lackey] Am resigning as of today 11-16-16[.]"[7] (*Id*. 90-94)." Lackey stated that Adams was not exhibiting threatening behavior at the time Adams asked for her written resignation. (*Id.* at 97). Lackey further testified that Adams did not back her into a corner, prevent her from leaving the room, and did not yell or scream at her. (*Id.*). Lackey stated that she did not want to resign, but she "felt like [she] was being forced to do something" and "just wrote what [Adams] told [her] to write." (*Id.*).

It is undisputed that Lackey wrote out the letter herself and did not protest doing so. (*Id*. at 99). She never told Adams that she did not want to resign, she did not tell Adams she did not want

---

[7] "Hutchinson" was Lackey's last name (from a previous marriage) at the time of the incident. (Doc. # 20-2 at 7).

5

to write the letter, and she did not tell Adams (or any other LPA employee) she wanted to keep working. (*Id.* at 95-99). Rather, Lackey wrote "I Sandra Hutchinson [Lackey] Am resigning as of today 11-16-16" and handed her resignation to Adams. (*Id.* at 95).

Lackey further claims that, after she wrote her resignation "[Adams] told [her] that [Adams] didn't want no white honky working for her and for [Lackey] to leave the center." (*Id.* at 95). After submitting her resignation, Lackey left LPA and went home. (*Id.* at 100). She did not tell Simms, Baity or any other LPA employees what happened (*Id.*). Additionally, Lackey never reported the incident to LPA human resources, the EthicsPoint Hotline, or the EthicsPoint Website. (*Id.*).

Lackey's testimony is disputed. LPA maintains, and Adams testified, that Lackey abruptly left LPA after the "coaching" conversation with Adams and Baity. (Doc. # 20-13 at 86-88). But, she returned to LPA at Simms's behest. Lackey remained at LPA until Baity told her to take a break to "get cooled off[.]" (*Id.*). Adams testified that after Lackey returned from lunch, Lackey informed her that she (Lackey) was resigning. (*Id.*). Adams told Lackey to give her a written resignation, and gave her a sheet of paper and pen. (*Id*. at 75, 87; Doc. # 20-7 at 8). Adams testified that Lackey submitted her written resignation and voluntarily left LPA. (Doc. # 20-13 at 75-77, 87). Adams denies calling Lackey a "white honky" or using any other racial terminology at any time. (*Id.* at 89).

Aside from this one isolated incident, Lackey testified that neither Adams, nor any other LPA employees, ever made any inappropriate comments to her. (Doc. # 20-2 at 96, 102). She also admits there was no other time when any employee engaged in racially discriminatory behavior during her tenure at LPA. (*Id.*).

Lackey filed her complaint in this court on March 19, 2018, alleging race discrimination under Title VII and § 1981. (Doc. # 1). Lackey maintains that she was constructively discharged, or alternatively, forced to resign from LPA due to her race.[8] LPA filed a Motion for Summary Judgment on July 8, 2019. (Doc. # 18). Lackey opposes the motion and asserts that the undisputed evidence in the Rule 56 file shows that Lackey voluntarily resigned. (*Id.*). After careful review, and for the reasons discussed below, LPA's Motion for Summary Judgment is due to be granted. (Doc. # 18).

**II.     Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d

---

[8] Although Lackey's Complaint is not a model of clarity, the court infers from her allegations that she claims she was constructively discharged, or alternatively, she was forced to resign from her employment at LPA.

1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**III.    Analysis**

As a general rule, a Title VII plaintiff faced with a Rule 56 motion has three different methods she can utilize to establish a triable issue of fact. "A [p]laintiff can [] present direct evidence of discriminatory intent[.]" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 n.6 (11th Cir. 2019) (en banc) (citing *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921-22 (11 Cir. 2018)). A plaintiff can also attempt to "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of [] discrimination." *Lewis*, 918 F.3d at 1221 n.6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Or, alternatively, a plaintiff can resort to using the *McDonnell Douglas* burden shifting framework to show that there is circumstantial evidence of discrimination. *Lewis*, 918 F.3d at 1221.

Plaintiff argues that the record contains direct evidence of LPA's discrimination.[9] (Doc. # 21 at 10-11). Alternatively, Plaintiff argues that the circumstantial evidence in the Rule 56 record is sufficient to support a determination that LPA discriminated against her due to her race. (*Id.* at 11-14). But, regardless of which framework the court employs in its analysis, this motion comes down to one key question: whether Plaintiff can show that she was subjected to an adverse employment action. In other words, under each of these methods of proof, a plaintiff must show that she suffered an adverse employment action. *Lewis*, 918 F.3d at 1221 ("[W]hen proceeding [with circumstantial evidence under] *McDonnell Douglas*, the plaintiff bears the initial burden of

---

[9] Lackey's argument that there is direct evidence of discrimination in this case is, at best, weak.

establishing a *prima facie* case of discrimination by showing . . . that she was subjected to an adverse employment action . . . ."); *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) ("Even where direct evidence of discrimination exists, [a plaintiff] must present evidence of an adverse employment action.");. *Smith v. Lockheed-Martin Corp.*, 644 F.3d at 1328 ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.") (citations omitted). Thus, Plaintiff's race discrimination claim hinges on whether there is sufficient evidence in the Rule 56 record that she has suffered an adverse employment action.

### A. Did Plaintiff Suffer an Adverse Employment Action?

"[F]or conduct to qualify as an adverse employment action, the conduct must, in some substantial way, alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." *Powell v. Nat'l Labor Relations Bd.*, 2019 WL 4572915, at *4 (N.D. Ala. Sept. 20, 2019) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)) (internal quotation marks omitted). "To determine whether an employment action is 'adverse,' courts use an objective test: whether a reasonable person in the plaintiff's position would consider the employment action materially adverse." *James v. City of Montgomery*, 2019 WL 3346530, at *7 (M.D. Ala. July 25, 2019). As the Eleventh Circuit has acknowledged, "[e]very qualified [protected] employee who gets fired . . . necessarily satisfies the first three prongs of the traditional prima facie case." *Lewis*, 918 F.3d at 1223. But, when an employee "resigns," the court must analyze whether there is Rule 56 evidence suggesting that the decision was not truly a resignation, or whether the resignation amounts to a constructive discharge. Here, presumably, Lackey claims

that she suffered an adverse employment action because she was constructively discharged, or alternatively, that she was forced to resign. Thus, it is necessary for the court to analyze these claims.

### 1. Was Plaintiff Constructively Discharged?

While constructive discharge is sometimes described as a "claim," under Title VII and § 1981, it is actually a type of adverse employment action. *Burden v. Int'l Longshoremen's Ass'n, Local No.1410*, 510 F. Supp. 2d 618, 625 (S.D. Ala. 2007) (citing *Rowell v. BellSouth Corp.,* 433 F.3d 794, 806–07 (11th Cir. 2005); *Akins v. Fulton County,* 420 F.3d 1293, 1300–01 (11th Cir. 2005); *Griffin v. GTE Florida, Inc.,* 182 F.3d 1279, 1283–84 (11th Cir. 1999). If a Title VII plaintiff can show that she was constructively discharged, this permits her to make a showing that she has been subjected to an adverse employment action.

"A '[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces h[er] to quit his job.'" *Walker v. Select Med. Rehab. Servs., Inc.*, No. 2:13-CV-02046-RDP, 2014 WL 411970, at *2 (N.D. Ala. Feb. 3, 2014) (citing *Bryant v. Jones,* 575 F.3d 1281, 1298 (11th Cir.2009)). In the Eleventh Circuit, this is a high standard. A plaintiff must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir. 1997) (quotation marks omitted). This is an objective standard and the threshold is high; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment. *See Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir. 2001) (citing *Landgraf v. USI Film Prods.,* 968 F.2d 427, 430 (5th Cir. 1992)); *see Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1363 (11th Cir.1994) ("A claim for constructive discharge requires the employee to demonstrate that the work

environment and conditions were so unbearable that a reasonable person in that person's position would be compelled to resign."). In addition to satisfying the objective standard, "[a] constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (affirming the district court's grant of summary judgment because none of the plaintiffs returned to work after the alleged constructive discharge, which did not allow sufficient time for their employer to correct the situation.). After careful analysis, the court concludes that Lackey's constructive discharge argument fails. This is so for several reasons.

First, the fact that Lackey faced the potential of involuntary termination is not enough. "The Eleventh Circuit has held that an employee's decision to resign in the face of possible termination is not a constructive discharge." *Graham v. Methodist Home for the Aging,* 2012 WL 3637587, at *20 (N.D. Ala. 2012) (citing *Rowell v. BellSouth Corp.,* 433 F.3d 794, 806 (11th Cir. 2005); *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir. 1995)). Furthermore, "[i]n this Circuit, a resignation will be considered voluntary as long as the plaintiff had a choice; it is of no moment that the alternatives to resignation may be 'unpleasant.'" *Alkhatib v. Steadman,* 2011 WL 5553775, *7, n. 7 (S.D. Ala. 2011) (citing *Hargray,* 57 F.3d at 1568-69). "A plaintiff cannot, as a matter of law, contend that she was discharged unless she can demonstrate that she had no objectively reasonable opportunity to remain employed." *Graham,* 2012 WL 3637587, at *20. "Indeed, 'the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'" *Graham,* 2012 WL 3637587 at *20 (quoting *Rowell,* 433 F.3d at 806). "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff

*had a choice. Plaintiff could stand [ ] and fight.*" *Hargray,* 57 F.3d at 1568 (quoting *Christie v. United States,* 518 F.2d 584, 587 (1975)) (internal quotations omitted; emphasis in original).

Second, the conditions Plaintiff faced (even based on her version of events) simply do not meet the high burden established by the Eleventh Circuit to establish a constructive discharge. *See, e.g., Poole v. Country Club of Columbus,* 129 F.3d 551, 553 (11th Cir. 1997) (reversing grant of summary judgment where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); *see also Wardwell v. Sch. Bd.,* 786 F.2d 1554, 1558 (11th Cir. 1986) (holding that no constructive discharge occurred where the female plaintiff was not given a promotion, the promotion went to a less-qualified male, and the plaintiff was given additional duties requiring her to work longer hours). For purposes of this motion, the court credits Plaintiff's testimony (as it must) that after she submitted her resignation Adams said she "didn't want no white honky working for her and for [Lackey] to leave the center." (Doc. # 20-2 at 95). But, that statement was made *after* Plaintiff had submitted her resignation— *i.e.*, *after* she had written the letter and handed it to Adams. Before her last day of employment at LPA, Lackey testified that she enjoyed going to work and was never subjected to racially discriminatory comments. A reasonable person would not consider this comment, which occurred *after* Lackey resigned, to constitute a materially adverse employment action. See *James*, 2019 WL 3346530, at *7.

Third, Plaintiff's version of events falls far short of satisfying the "severe or pervasive" standard necessary to establish a claim for a hostile work environment. That is, the Rule 56 facts, even when viewed most favorably to Lackey, do not support her assertion that she was constructively discharged. This is because there is simply no substantial evidence that Lackey faced any type of intolerable work conditions (much less that she did so at any time before she

13

wrote and submitted her letter of resignation). Because Plaintiff had a choice, her resignation is considered voluntary. *See Hargray,* 57 F.3d at 1568-69. Nothing about the last day of Plaintiff's employment would have *compelled* a reasonable person to resign. So, while a person in Lackey's shoes could have *chosen* to quit, there is no Rule 56 evidence that a reasonable person in her position would have viewed her work conditions as so severe and pervasive that she would have been compelled to quit. Plaintiff simply has fallen far short of establishing any facts necessary to prove a constructive discharge.

Fourth, Lackey's claim that was subjected to a single isolated comment from Adams *after* she submitted her written resignation. The fact that the statement was made after she submitted the letter shows that it had no bearing on her decision to do so. But, even if it were made before that, a single racially motivated comment usually falls well below the requisite "severe or pervasive" standard. *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 894–95 (11th Cir. 2013) (holding that a single incident in which supervisor criticized employee was insufficient to establish pervasive conduct necessary to show constructive discharge); s*ee Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir. 1987) ("[I]n general, a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge.") (quotation marks omitted); *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985) ("An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.").[10]

---

[10] Even if a racially motivated comment occurred during Lackey's employment, Lackey has failed to establish that the alleged harassment was so "severe or pervasive" that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Poole.,* 129 F.3d 551, 553 (11th Cir. 1997) (quotation marks omitted). Lackey testified that she enjoyed going to work at LPA and never witnessed any other racially disparaging behavior from LPA employees. *But cf. Bryant v. Jones,* 575 F.3d 1281, 1289–90, 1298–99 (11th Cir. 2009) (holding that plaintiff established constructive discharge claim with evidence that her employer "was abusive . . . . on numerous occasions, including an interaction where he appeared ready to assault [the plaintiff] physically" and severely

14

Finally, LPA was never given a chance to remedy any of the alleged unfavorable work conditions. "[A] constructive discharge will generally not be found if the employer is not given adequate time to remedy the situation." *See Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir.1996). "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir. 1987). Lackey testified that she did not notify any of her supervisors at LPA of Adam's statment, or utilize the anonymous reporting procedures detailed in the employee handbook to report it. Neither life nor the law favor quitters, particularly people who resign without giving their employers a change to remedy the perceived wrong. *Russell v. Sealing Equip. Prod. Co.,* 2013 WL 6145333, at *8 (N.D. Ala. Nov. 20, 2013).

For all these reasons, the court concludes Lackey has not shown there is any Rule 56 evidence to support her assertion that she was constructively discharged.

## 2. Was Plaintiff Forced to Involuntarily Resign?

"An involuntary resignation that constitutes a constructive discharge is an adverse employment act under Title VII[.]" *See, e.g.*, *Ross v. City of Perry, Ga.*, 396 F. App'x 668, 670 (11th Cir. 2010) (citing *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993)). But, the question here is whether Lackey's resignation was involuntary. A resignation is deemed involuntary where the employer "(1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* (citing *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir. 1995)). "As an initial matter, employee resignations are presumed to be voluntary." *Id.*

---

restricted the plaintiff's responsibilities); *Poole,* 129 F.3d at 553 (holding that plaintiff submitted sufficient evidence to establish constructive discharge claim when she was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").

In this Circuit, under the coercion or duress theory, courts consider whether, "under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." *Id*. Under the totality of the circumstances test, the following factors may guide a courts analysis in determining whether a resignation was voluntary:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [s]he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Id.*; *see Carpenter v. Univ. of Alabama Health Servs. Found. PC*, 773 F. App'x 507, 514 (11th Cir. 2019).

Here, the Rule 56 evidence, even when considering the totality of the circumstances, shows that it is undisputed that Lackey's resignation was voluntary. Lackey testified that she was not intimidated, blackmailed, or subject to coercion or duress when Adams asked her to write out the resignation. And, Lackey did not state that she was tricked or deceived into writing her resignation. Further, application of the factors identified in *Hargray* does not support an involuntary finding.

As to the first factor, the Rule 56 evidence, when viewed in the light most favorable to Lackey, indicates that while she was asked to resign, she was not deprived of alternatives to resignation. *Hargray*, 57 F.3d at 1568 (11th Cir. 1995) ("Resignations obtained in cases where an employee is faced with [] unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff *had a choice.* [Plaintiff] could stand [] and fight.'") (citations omitted). Lackey could have refused to write her resignation form, she could have reported the comment to her superiors or human resources, and she could have anonymously reported the incident via the available procedures (which were plainly listed in the employee handbook). But, she chose none of these alternatives.

Second, Lackey testified that she understood the nature of the choice she was given when Adams handed her a paper and a pen to write out her resignation. Lackey had previously received two copies of the employee handbook, which detailed LPA "notice" and resignation policies. *Carpenter*, 773 F. App'x at 513-14 (11th Cir. 2019) (finding that plaintiff understood there was a choice available to him (even if was unclear about his options) because the options were listed in his employer's handbook).

Third, though Lackey was likely surprised by Adams' request that she write her resignation letter, she did not ask Adams if she could take any additional time to consider doing so. Further, the Rule 56 evidence does not show that Lackey was forced into making an on the spot decision between resignation and termination. *Cf. Rodriguez v. City of Doral*, 863 F.3d 1343 (11th Cir. 2017) (concluding that that an employee was not given a reasonable time when he had only five minutes to decide whether to resign or accept his termination)

Fourth, Lackey was told by Adams to write a specific date on her resignation form. Again, Lackey did not ask if she could give two weeks' notice, or follow the "notice" procedures outlined in the handbook. Rather, Lackey wrote the date, signed her name, and headed home.

Fifth, Lackey did not have the advice of counsel. But, again, she did not seek counsel, nor did she ask for time to consult with counsel. *See Carpenter*, 773 F. Appx 507 at 514. ("[T]he advice of counsel factor carries little weight here given that plaintiff chose not to seek legal advice[.]").

Viewing the facts in the light most favorably to Lackey, the undisputed Rule 56 evidence shows that Lackey's involuntary resignation claim cannot pass muster. Lackey has failed to establish an adverse employment action, and for that reason her Title VII and § 1981 claims necessarily fail.

## IV. Conclusion

For all of the reasons discussed above, Defendant's Motion (Doc. # 18) is due to be granted.

An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this March 16, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE